# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br><br>v.<br><br>NIRMAL MULYE,<br>    Defendant. | No. 25-cv-12112 |

## COMPLAINT

1. In October 2023, Nostrum Laboratories, Inc. ("Nostrum"), and its founder and Chief Executive Officer ("CEO") Nirmal Mulye, Ph.D. ("Mulye"), agreed to pay up to $50 million to resolve allegations that they violated the False Claims Act by knowingly underpaying Medicaid rebates due for Nostrum's drug Nitrofurantoin Oral Suspension. That agreement is memorialized in a settlement agreement, attached as Exhibit A (the "Settlement Agreement").

2. As part of the Settlement Agreement, Mulye himself agreed to pay the United States and certain state Medicaid programs at least $1,500,000, plus more if certain contingencies were met.

3. Mulye defaulted on that Settlement Agreement by failing to make the required payments. Even though the United States notified Mulye of his default, Mulye failed to cure that default.

4. Mulye thereafter agreed to enter into a consent judgment for the amount that he owes the federal government pursuant to the Settlement Agreement.

5. The United States brings this complaint to enforce the Settlement Agreement and to seek entry of that consent judgment as a judgment of this Court.

## JURISDICTION AND VENUE

6. This action arises under the False Claims Act ("FCA"), as amended, 31 U.S.C. §§ 3729-33. This Court has jurisdiction over this action under 28 U.S.C. § 1345.

7. Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b).

## THE PARTIES

8. Plaintiff United States, acting through the Department of Health and Human Services ("HHS"), administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* ("Medicare").

9. Defendant Mulye was the CEO of Nostrum and resides in Miami, Florida. Nostrum is the manufacturer of pharmaceutical products and does business nationwide.

## FACTUAL ALLEGATIONS

### The Government's Allegations Against Nostrum and Mulye

10. In order to obtain federal reimbursement for its covered outpatient drugs under any state Medicaid programs, *see* 42 U.S.C. §§ 1396-1396w-5 ("Medicaid"), all of which the federal government jointly finances with the states, a pharmaceutical manufacturer must opt into the Medicaid Drug Rebate Program ("MDRP"). The MDRP's implementing statute, 42 U.S.C. § 1396r-8 (the "Rebate Statute"), requires such manufacturers to enter into a rebate agreement.

11. On or about August 16, 2016, Nostrum entered into a rebate agreement ("Rebate Agreement") with HHS. At all times relevant to this Complaint, Nostrum was party to that Rebate Agreement with HHS.

12. The Rebate Statute and implementing regulations set forth certain terms of the Rebate Agreement. *See* 42 C.F.R. § 447.510. The Rebate Statute and Rebate Agreement require, among other things, the manufacturer to pay to each state Medicaid program a quarterly

amount that potentially includes an inflation-adjusted "additional rebate" for each "dosage form and strength" of a covered outpatient drug. *See* 42 U.S.C. § 1396r-8(c)(2)(A). For example, for "a covered outpatient drug that is first marketed as a drug other than a single source drug or an innovator multiple source drug after April 1, 2013," manufacturers must also pay an inflation-based rebate equaling the difference, if any, between the drug's current quarter AMP and its AMP in the "applicable quarter" (which is defined as the "fifth full calendar quarter after which the drug is first marketed") adjusted by the rate of inflation. 42 U.S.C. § 1396r-8(c)(3). The AMP that serves as the starting point for the "additional rebate" calculation is commonly called the "Base Date AMP," and the quarter with which that price is associated is referred to as the "Base Date AMP" quarter. The Rebate Agreement requires manufacturers to make the proper rebate payments "not later than 30 days after receiving the state rebate invoice" and also requires manufacturers to "comply with the conditions of the [Rebate Statute], changes thereto, implementing regulations, agency guidance, and [the Rebate Agreement]."

13. Nostrum is a privately held New Jersey corporation with its principal places of business in Missouri and New Jersey and an office in New York that does business as a pharmaceutical manufacturer and markets Nitrofurantoin Oral Suspension in the United States under Abbreviated New Drug Application ("ANDA") number 201355 ("Nitro OS"). Nitro OS is an oral suspension antibacterial agent.

14. Another manufacturer secured the FDA approval for Nitro OS in August 2013 and began to market it in January 2014. Nostrum then acquired exclusive rights to manufacture and market Nitro OS in 2015. At all relevant times, Nostrum sold Nitro OS under National Drug Code number 70408-239-32 and marketed it under ANDA number 201355.

15. Nitro OS is a "noninnovator multiple source drug" for purposes of the Medicaid Rebate Program.

16. As mentioned above, Mulye was the founder and CEO of Nostrum. At all relevant times, Mulye maintained ultimate control of Nostrum and, either directly or through other entities he is the sole owner of, and maintains a 90 percent ownership interest in Nostrum.

17. After an investigation into Nostrum's conduct, the United States contended (1) that Nostrum and Mulye submitted or caused to be submitted claims for payment to Medicaid for Nitro OS; (2) that Nostrum entered into a Rebate Agreement with the Secretary of HHS in exchange for Medicaid's coverage of Nitro OS; (3) that Nostrum, under the Rebate Agreement and Rebate Statute, was required to submit pricing information on a quarterly basis to the Centers for Medicare and Medicaid Services ("CMS") regarding Nitro OS and pay the correct quarterly rebates to state Medicaid programs per unit of Nitro OS dispensed to Medicaid beneficiaries, as determined by the statutory formula set forth in the Rebate Statute, and based on which rebate invoices are sent by State Medicaid programs to Nostrum.

18. The United States further contended that it had certain civil claims against Nostrum and Mulye, from October 1, 2018 through March 31, 2020, for Nostrum and Mulye failing to pay the required rebate amounts owed for Nitro OS as required by the Rebate Statute and Rebate Agreement and as invoiced by State Medicaid programs.

## The Settlement Agreement

19. On October 24, 2023, Nostrum and Mulye entered into the Settlement Agreement.

20. Mulye's signature appears on page 23 of the Settlement Agreement, both as Chairman and Executive Officer of Nostrum and for himself.

21. In the Settlement Agreement, Nostrum and Mulye "admit[ted], acknowledge[d], and accept[ed] their responsibility for the following facts:

   a. Nostrum acquired Nitro OS from another manufacturer in December 2015 and continued to market the product pursuant to Nitro OS's preexisting FDA approval, ANDA Number 201355. In response to January 2018 FDA updated guidance tightening tolerances for elemental impurities in various drug products, Nostrum ceased manufacturing and marketing Nitro OS temporarily because the amount of lead in Nitro OS, resulting from Nostrum's formulation at the time, did not comply with the 2018 FDA guidance. Nostrum resumed manufacturing and marketing Nitro OS in August 2018, after having adjusted its Nitro OS formulation to address the new FDA impurities guidance by reducing lead levels and modifying quantities of two inactive ingredients. Nostrum has characterized the relaunched version of Nitro OS as a "reformulation." Nostrum did not add or subtract any ingredients and the active ingredients remain unchanged; Nitro OS also remained in the same dosage form and strength as it did prior to 2018. Nostrum continues to market this newer version of Nitro OS under the same FDA Approval, ANDA 201355, as the pre-2018 version and maintains with FDA that it is legal to do so because no major changes have been made to the drug.

   b. After relaunching Nitro OS in August 2018, Nostrum increased its price from $474.75 to $2,392.32 per bottle. Beginning with the third quarter of 2018, Nostrum received invoices from state Medicaid Programs reflecting significantly increased Medicaid rebates owed. Based on its later

investigation, Nostrum found out that these larger rebate invoices were on account of the Nitro OS price increase triggering the inflation-based Medicaid rebate.  Nostrum paid these increased rebates as invoiced by the states for the third quarter of 2018.  Thereafter, Nostrum and Mulye did not pay the entire amount of the invoiced amounts due, which included amounts that accounted for the price increase.  Nostrum wrote to CMS arguing that it should not have to pay the inflation-based amount because its Nitro OS is a "new" drug after its 2018 relaunch and, therefore, should not have to pay rebates based upon the "old" version of Nitro OS's 2015 Base Date AMP.  In a subsequent teleconference and in correspondence with CMS personnel, including the director of the pertinent CMS division, Nostrum and Mulye understood that: 1) CMS did not agree with Nostrum's position; and 2) that CMS's position was that Nostrum should pay its calculated rebate amount going forward, based upon the Q2 2015 Base Date AMP, and that Nostrum should repay any underpayments so far.  Nostrum did not and instead chose to terminate the applicable Rebate Agreement, effective March 30, 2020, with partial balances due for Q4 2018 through Q1 2020." *See Exhibit A*, p. 3-4 ¶ G.

22. Nostrum further admitted and agreed that: "the correct Base Date AMP Quarter for Nitro OS is Q2 2015 and that, accordingly, the correct Base Date AMP for Nitro OS is Nitro OS's AMP from Q2 2015." *See id.* at 4 ¶ H.

23. As part of the Settlement Agreement, Nostrum and Mulye agreed to enter into separate settlement agreements with certain states ("Medicaid Participating States"). *See id.* at 5 ¶ I.

24. Mulye entered into the Settlement Agreement freely and voluntarily without any degree of duress or compulsion, as he represented in Settlement Agreement ¶ 16.

25. Mulye entered into the Settlement Agreement after consultation with his attorney, Gregory Miller.

26. Mulye's attorney also signed the Settlement Agreement on page 23 and represented in Settlement Agreement ¶ 19 that he was "fully authorized to execute this Agreement on behalf of the persons and entities indicated below."

27. As part of the Settlement Agreement, Nostrum and Mulye agreed that they would collectively pay the United States and the Medicaid Participating States $3,825,000. Specifically, Nostrum would pay $2,325,000 in nine installments over five years, and Mulye would pay $1,500,000 in nine installments over five years.

28. Specifically, Mulye agreed to pay "to the United States and the Medicaid Participating States collectively one million five hundred thousand dollars ($1,500,000) in nine installments pursuant to the payment schedule described in Exhibit B [of the Settlement Agreement] ('Mulye Fixed Settlement Amount'). Of the Mulye Fixed Settlement Amount due pursuant to the payment schedule described in Exhibit B, Mulye shall pay a total of seven hundred ninety-five thousand dollars ($795,000) to the United States (collectively the 'Mulye Federal Fixed Settlement Amount') by electronic funds transfer pursuant to written instructions to be provided by the Office of the United States Attorney for the District of Massachusetts, and Mulye shall pay a total of seven hundred five thousand dollars ($705,000) to the Medicaid Participating States pursuant to the terms of the Medicaid State Settlement Agreements ('Mulye State Fixed Settlement Amount')." *See* Settlement Agreement at 8 ¶ 1(b).

29. Mulye also agreed to make contingency payments to the United States and Medicaid Participating States which were divided on the same pro-rata basis as the settlement amount for Nostrum and using the same payment method. *See id.* at 8-9 ¶ 1(b).

**Mulye's Conduct After Executing the Settlement Agreement**

30. Mulye paid the first four installments to the state and federal governments, totaling $250,000. Nostrum had reimbursed Mulye for these payments.

31. On September 26, 2024, in response to a request for a modification from Mulye and Nostrum's counsel based upon Mulye's and Nostrum's alleged continued inability to pay, the government agreed in writing to a one-time courtesy payment schedule modification. This communication—and the corresponding modification of the payment schedule—are attached hereto as Exhibit B.

32. The government also agreed in writing to spread the fifth payment—originally due in November 2024—into several sub-installments over the next year, while holding all subsequent yearly payments to their original due dates and amounts.

33. The government informed Nostrum and Mulye's counsel of these terms in writing and that the government would not be inclined to recommend further modifications to the payment schedule, which Nostrum and Mulye, through their counsel, acknowledged.

34. On September 30, 2024, Nostrum filed a bankruptcy petition in the United States Bankruptcy Court for the District of New Jersey. Nostrum suspended its payments to the United States under the Settlement Agreement at that point in light of the automatic stay, *see* 11 U.S.C. § 362.

35. Mulye also has not made any payments since Nostrum declared bankruptcy, despite Mulye not declaring bankruptcy personally and the automatic stay thus not applying to him.

36. On November 3, 2024, according to the stipulated payment schedule, Mulye was scheduled to pay $13,250 to the United States. He failed to do so.

37. The Settlement Agreement provides the United States with remedies for default. Specifically, paragraph 13 of the Settlement Agreement provides, in part, that:

   a. In the event that Nostrum fails to pay any portion of the Nostrum Settlement Amount or in the event that Mulye fails to pay any portion of the Mulye Settlement Amount, the party failing to make such payment ("Defaulting Party") shall be in default of their payment obligations under this Agreement ("Default"). The United States will provide a written Notice of Default, and the Defaulting Party shall have an opportunity to cure such Default within fourteen (14) days from the date of receipt of the Notice of Default by making the payment due under the payment schedule. . . . If Defaulting Party fails to cure the Default within fourteen (14) calendar days of receiving the Notice of Default and in the absence of an agreement with the United States to a modified payment schedule ("Uncured Default"), the remaining unpaid balance of the Settlement Amount shall become immediately due and payable subject to and in accordance with their respective terms, and interest on the remaining unpaid balance shall thereafter accrue at the rate of five percent (5%) per annum, compounded daily from the date of Default, on the remaining unpaid total (principal and interest balance).

   b. In the event of Uncured Default, the Defaulting Party agrees that the United States, at its sole discretion, may (i) retain any payments previously made, rescind this Agreement, or bring any civil and/or administrative claim, action, or proceeding against the Defaulting Party for the claims that would otherwise be covered by the releases provided in Paragraph 3 and 4 above, with any recovery reduced by the amount of any payments previously made by Defaulting Party to the United States under this Agreement; (ii) take any action to enforce this Agreement; (iii) offset the remaining unpaid balance from any amounts due and owing to Defaulting Party and/or affiliated companies by any department, agency, or agent of the United States at the time of Default or subsequently; and/or (iv) exercise any other right granted by law, or under the terms of this Agreement, or recognizable at common law or in equity. The United States shall be entitled to any other rights granted by law or in equity by reason of Default, including referral of this matter for private collection. In the event the United States pursues a collection action, the Defaulting Party agrees immediately to pay the United States the greater of (i) a ten-percent (10%)

surcharge of the amount collected, as allowed by 28 U.S.C. § 3011(a), or (ii) the United States' reasonable attorneys' fees and expenses incurred in such an action. In the event that the United States opts to rescind this Agreement pursuant to this paragraph, Nostrum and Mulye waive and agree not to plead, argue, or otherwise raise any defenses of statute of limitations, laches, estoppel or similar theories, to any civil or administrative claims that are (i) filed by the United States against Nostrum and Mulye within 120 days of written notification that this Agreement has been rescinded, and (ii) relate to the Covered Conduct, except to the extent these defenses were available on the Effective Date of the Agreement. Nostrum and Mulye agree not to contest any offset, recoupment, and /or collection action undertaken by the United States pursuant to this paragraph, either administratively or in any state or federal court, except on the grounds of actual payment to the United States.

38. Pursuant to Paragraph 13 of the Settlement Agreement, the United States sent Mulye, through counsel, a notice of default on November 8, 2024 ("Date of Default").

39. A copy of the default notice sent to Mulye on November 8, 2024 is attached as Exhibit C.

40. Pursuant to the Settlement Agreement and as detailed above, if "the Defaulting Party fails to cure the Default within fourteen (14) calendar days of receiving the Notice of Default and in the absence of an agreement with the United States to a modified payment schedule ('Uncured Default'), the remaining unpaid balance of the Settlement Amount shall become immediately due and payable subject to and in accordance with their respective terms, and interest on the remaining unpaid balance shall thereafter accrue at the rate of five percent (5%) per annum, compounded daily from the date of Default, on the remaining unpaid total (principal and interest balance)." *See* Settlement Agreement at ¶ 13(a).

41. Mulye failed to cure the default within 14 days. Mulye therefore entered Uncured Default, as defined in the Settlement Agreement, as of at least November 22, 2024.

42. Since that date, the United States has not agreed to forbear Mulye's debt and Mulye has not made any additional payments to the United States.

43. In fact, as of June 26, 2025, Mulye only made $132,500 in payments towards the Mulye Federal Fixed Settlement Amount. Accordingly, $662,500 of the Mulye Federal Fixed Settlement Amount is outstanding, not including interest.

44. The United States now brings this collection action under Paragraph 13(b) of the Settlement Agreement.

45. Per Paragraph 13(b), Mulye has "agree[d] not to contest any . . . collection action undertaken by the United States pursuant to this paragraph, either administratively or in any state or federal court, except on the grounds of actual payment to the United States."

46. On June 2, 2025, Mulye consented to the filing of a consent judgment ("Consent Judgment") to enter against him in the amount of $662,500, plus interest at the rate of five percent (5%) per annum, compounded daily from the Date of Default (November 8, 2024) until the Consent Judgment is satisfied. A copy of that Consent Judgment, which Mulye has signed, is attached as Exhibit D.

## COUNT I

### (Breach of Contract)

47. The United States re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

48. A valid contract was formed when the United States and Mulye entered into the Settlement Agreement.

49. Mulye breached that agreement by failing to comply with the payment schedule contained within the contract.

50. Mulye failed to cure his default on that agreement.

51. As a result of that breach, the United States has suffered, and continues to suffer, monetary damages.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, the United States, requests that judgment be entered in its favor as follows:

I. The Court enter the Consent Judgment;

II. To the extent the Court does not enter the Consent Judgment, on Count I, $662,500 plus interest, and the greater of (i) a ten-percent (10%) surcharge of the amount collected, as allowed by 28 U.S.C. § 3011(a), or (ii) the United States' reasonable attorneys' fees and expenses incurred in such an action; and

III. All other and further relief as the Court may deems just and proper.

The United States hereby demands a jury trial on all claims alleged herein.

Date: July 28, 2025                    Respectfully submitted,

                                       LEAH B. FOLEY
                                       United States Attorney

                                By:    /s/ *Lindsey E. Weinstein*
                                       LINDSEY E. WEINSTEIN
                                       Assistant United States Attorney
                                       United States Attorney's Office
                                       District of Massachusetts
                                       One Courthouse Way, Suite 9200
                                       Boston, MA 02210
                                       617-748-3100
                                       lindsey.weinstein.herscovici@usdoj.gov